IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

GREGG R. POPKIN, D.C. and          )
ATLANTIC MEDICAL, INC.             )
            PLAINTIFFS,            )
                                   )
                                   )
                                   )  Civil Action No.
      vs.                          )
                                   )
Hon. Sylvia Mary Mathews Burwell,  )
Secretary,                         )
United States Department of        )
Health and Human Services,         )
in her official capacity,          )
                                   )
And                                )
                                   )
United States Department of        )
Health and Human Services          )
DEFENDANTS unless otherwise noted) )
Jointly in their official capacity )
                                   )
Both located at:                   )
Humbert H Humphrey Building        )
200 Independence Avenue, SW        )
Washington, D.C. 20201             )

VERIFIED COMPLAINT FOR JUDICIAL REVIEW
AND FOR INJUNCTIVE AND DECLARATORY RELIEF

Now comes Plaintiffs, Gregg R. Popkin, D.C., and Atlantic Medical, Inc.,

and complain unto this Honorable Court for injunctive and declaratory relief from

Medicare audits and recoupments by Defendant Secretary for the reasons cited

herein as follows:

## Jurisdictional Facts

1. The jurisdiction of this Court is founded upon 42 USC 405(g); 28

U.S.C. 1331; 28 USC 1346; 28 USC 1651; 28 U.S.C. 2201-2202; 5 U.S.C.

701, et. Seq. and 5 U.S.C. 702. Further, this action arises under the

Constitution and laws of the United States; including but not limited to:

Amendment V (procedural and liberty due process of law) and also under 42

U.S.C. 1395 et seq.; and 5 USC 552, et seq.  [Administrative Procedure Act

(APA)], including 5 USC 553 [authority to issue regulations]. Jurisdiction further

arises from the facts that Plaintiffs are a citizen of the United States and a United

States incorporated entity and Defendants are the Secretary (hereinafter

"Defendant Secretary") of the United States Department of Health and Human

Services (hereinafter "HHS") and a Departmental agency [HHS] of the United

States.

2. This Court has jurisdiction under the United States Constitution Fifth Amendment.

### Parties and Venue

3. Venue lies in this District pursuant to 28 U.S.C. 1391(e).

4. The Secretary Hon. Sylvia Mary Mathews Burwell [hereinafter, Secretary] and the U.S. Department of Health and Human Services [hereinafter, Department or HHS] are found in the District, do business in the District and conducts its ultimate administrative functioning and decision making is in the District and a substantial part of the events, acts and omissions giving rise to the claims which have occurred or are occurring are in the District and relevant records and documents are maintained in the District. The Defendant Secretary's Administrator for the Centers for Medicare Medicaid Services [hereinafter, CMS] is currently Andrew Slavitt who is conducts his business in the District and has his official address in the Humbert H Humphrey Building, Washington, DC. Unless otherwise noted, the Secretary and HHS are to be considered for the purposes of this suit to be one. The Defendant Secretary and Defendant Department, unless otherwise specified, are jointly referred to as Defendants or Defendant. Both are being charged in their official capacities. The Administrator of Medicare may be

referenced herein as the "Administrator". The Administrator is not a defendant herein but is an agent, employee and official of the Defendants.

5. The Secretary's official address is Humbert H. Humphrey Building, 200 Independence Avenue, SW, Washington DC 20201.

6. Defendant Secretary has been authorized by Congress to implement the Medicare (42 U.S.C. 1395, et seq.) and Medicaid programs (42 U.S.C. 1396, et seq.).

7. Plaintiff Gregg R. Popkin, D.C., resides in the State of Florida.

8. Plaintiff Gregg R. Popkin, D.C., [herein after, Plaintiff Popkin, Popkin or Dr. Popkin] is a chiropractic physician who is authorized under the laws of the State of Florida to own and operate a medical practice [not chiropractic] and does solely own such a primary medical care practice, which is named Atlantic Medical, Inc.

9. From July 2013 until August 2015, Dr. Popkin did operate Atlantic Medical, Inc., [hereinafter, Atlantic or Atlantic Medical or Atlantic Medical, Inc.] as a provider to patients of medical items and services under various insurance and government programs such as Medicare, until it was forced to close its doors due to the acts and omissions committed by the Defendants as

described herein. Atlantic did provide these services through various medical doctors as employed medical physicians and other personnel as authorized in the State of Florida.

10. Due to the acts and omissions of the Defendants as set out in this complaint, Atlantic Medical, Inc., did have to discontinue and cease the conduct of its business and the operations and its rendering of patient care.

11. Plaintiff Atlantic Medical, Inc., has been irreparably injured as a result of these acts and omissions of the Defendants.

12. Plaintiff Popkin has been irreparably injured as a result of these acts and omissions of the Defendants.

13. Plaintiff Atlantic Medical is a Florida corporation, which is solely owned by Dr. Gregg Popkin, and that until recently conducted a general primary medical care practice as its primary business.

14. As part of its general primary medical care practice, Plaintiff Atlantic Medical did conduct and undertake, as part of its business of the practice of medicine, particular pain management treatment protocols, as more fully described herein, that are not otherwise available to patients, within a radius of approximately 50 miles, and which Plaintiff Atlantic Medical did previously,

exclusively afford them within that radius.

15. These particular pain management treatment protocols are extremely clinically effective and cost effective protocols for the treatment of pain.

16. As of August 2015, Plaintiff Atlantic Medical does not conduct nor undertake the business of the practice of medicine or any other business and its patients are without the particular pain management treatment protocols, as more fully described herein, within a radius of approximately 50 miles, which Plaintiff Atlantic Medical did previously, exclusively afford them within that radius.

17. If Plaintiff Popkin and Plaintiff Atlantic Medical are afforded injunctive relief as requested herein, Plaintiff Popkin will be able to reverse the irreparable injury to Atlantic Medical and it will be able to reopen its doors and serve is Medicare and other patient population many of whom would not be able, in their geographic area, to receive the specialized pain management care otherwise available through Atlantic Medical.

18. If Plaintiff Popkin and Plaintiff Atlantic Medical are not afforded injunctive relief as requested herein, Plaintiff Popkin will not be able to reverse the irreparable injury to Atlantic and both will be irreparably injured, even if years in

the future, Defendants administratively reverse their reimbursement determinations as to Plaintiffs.

19. Additionally, if injunctive relief is not afforded to Plaintiff Popkin and Plaintiff Atlantic Medical, the patients will be irreparably injured and without the particular pain management treatment protocols, as more fully described herein, within a radius of approximately 50 miles, which Plaintiff Atlantic Medical did previously, exclusively afford them within that radius.

20. Hon. Sylvia Mary Mathews Burwell is the Secretary and Chief Executive Officer of HHS and is responsible for the operation and effectuation of the Medicare Program under 42 U.S.C. 1395, et seq.

21. HHS is an agency under 5 U.S.C. 552, et seq., the Administrative Procedure Act.

22. The Defendant Secretary's Administrator for the Centers for Medicare Medicaid Services [hereinafter, CMS] is currently Andrew Slavitt [hereinafter, Administrator]. The Administrator is responsible for executing the Secretary's policy pertaining to the Medicare Program.

**Preliminary Facts**
**Atlantic Medical's Unique Services for Its Physical Area of Service**

23. While Atlantic Medical has a practice that services patients as to

multi-facets of human needs, it has developed a particular aspect of its practice that focuses on Osteoarthritis of the knees as well as other joints.

24. Atlantic is the only clinic in Miami using Hyalgan, which is Viscosupplementation for the knee utilizing fluoroscopy.

25. In this procedure, a gel-like fluid called hyaluronic acid is injected into the knee joint. Hyaluronic acid is a naturally occurring substance found in the synovial fluid surrounding joints. It acts as a lubricant to enable bones to move smoothly over each other and as a shock absorber for joint loads. People with osteoarthritis have a lower-than-normal concentration of hyaluronic acid in their joints. The theory is that adding hyaluronic acid to the arthritic joint will facilitate movement and reduce pain.

26. This procedure allows its physicians to view inside the joints in real time with the latest in imaging technology while administering any of its minimally invasive injection procedures.

27. This procedure has been documented by Harvard as appropriate for these type of diagnosis.

28. This instrument helps to insure that the injected material is introduced to the exact appropriate point of injection and therefore provides the

best possible outcome from each injection.

29. This is necessary as most of Atlantic Medical's patients have a deformity of the joint from the O.A.

30. It is documented that a blind injection misses the mark over 40% of the time in an O.A. knee.

31. Atlantic Medical is the only clinic in south Florida undertaking these injections using this protocol.

32. The next closest office is in West Palm Beach.

33. There are about 50 clinics across the country following this procedure.

34. Harvard has published a study that shows the effectiveness of using the fluoroscope for Viscosupplementation and that it increased success rate from the medication up to over 90% from 55%.

35. This procedure has helped many of Atlantic Medical's patients regain their quality of life and the procedure has gotten them out of wheelchairs and walkers and given them their independence back.

36. Most of Atlantic Medical's patients have tried many other forms of treatment, including injections, physical therapy, NSAID's, Weight management and education about the joints with little favorable results.

37. When the patients start on Atlantic Medical's program, their activities of daily living become much easier to perform and their joints function with much less pain and increased stability to function throughout the day.

38. Atlantic Medical's have saved Medicare millions of dollars, as we keep our patients from having a new replacement surgery, which can exceed $50,000 - $75,000, contrast that to a series of injections that usual cost less than $1,000.

39. This protocol can give up to two years of relief from symptoms before having to be repeated.

40. Most of Atlantic Medical's patients refuse to have surgery for many different reasons, including surgery being ineffective in many cases, and look to Atlantic Medical's office for the help they need.

41. Without Atlantic Medical's availability, many of these patients will be without this option due to the distance to the next available service provider which renders this type of procedure. These patients will be in substantial pain and discomfort due to the unavailability of Atlantic Medical's treatment protocol.

42. There are four main "parts" of Medicare insurance: Part A, Part B, Part C, and Part D. Medicare Part A (hospital insurance) and Medicare Part B

(medical insurance) together make up Original Medicare. Medicare Part C, also known as Medicare Advantage, and Medicare Part D (prescription drug coverage) are private health insurance sold by various companies under contract with the Medicare program. There is also Medicare Supplement insurance (also called Medigap), which is sold by private companies under contract with Medicare program.

43. Original Medicare consists of Medicare Part A (hospital insurance) and Medicare Part B (medical insurance). Most people are automatically enrolled in Medicare Part A and Part B when they turn 65 or if they collect disability benefits for a certain period of time.

44. Most Medicare beneficiaries do not pay a premium for Medicare Part A. But most beneficiaries do pay some premium for Part B coverage based upon income. In brief, Medicare Part A covers inpatient care in facilities such as (but not limited to) hospitals and skilled nursing facilities. Medicare Part A also covers hospice care and limited home health care.

45. Medicare Part B is medical insurance that covers doctor visits, medically necessary services and supplies, preventive services, and certain other items and services. Beneficiaries typically have to pay a premium to

receive Part B coverage.

46. The federal government manages Original Medicare, which operates as a fee-for-service plan. Most beneficiaries pay a deductible as well as a copayment or coinsurance for these services. These deductibles and co-payments may be covered by authorized Supplemental Insurance.

47. Medicare Advantage (Medicare Part C) is optional private insurance through which you can receive your Original Medicare, Part A and Part B, coverage. Most Medicare Advantage plans include prescription drug coverage. Types Medicare Advantage plans include Health Maintenance Organizations (HMOs), Preferred Provider Organizations (PPOs), Private Fee-for-Service (PFFS) plans, Special Needs Plans (SNPs), and Medical Savings Account (MSA) plans. Part C plans may have lower costs than Original Medicare and may provide additional benefits; details vary among insurance companies and individual plans. They also may have more limitations and restrictions for the more costly treatments and services.

48. Medicare Part D is prescription drug coverage. You can buy a standalone Part D plan to work alongside your Original Medicare coverage, or you can get all your Medicare coverage through a Medicare Advantage

Prescription Drug plan.

49. If a beneficiary buy coverage under a Part D plan, make sure he/she should choose a plan that covers his/her medications. Every Part D plan has a formulary that lists the drugs it covers, and many plans make their formularies available online. Not all drugs are covered by all formularies.

50. Most beneficiaries have to pay a premium for Medicare Part D, along with other costs such as copayments and coinsurance; these costs vary among plans. Although this insurance is optional, if you don't enroll when you're first eligible for Medicare, you could face a late enrollment penalty if you later decide you want this coverage.

51. Original Medicare insurance plans don't cover everything. If a beneficiary decides to stay with Original Medicare (instead of switching to Medicare Part C), then he/she can purchase a Medicare Supplement (also called Medigap) plan to help cover Original Medicare's out-of-pocket costs, such as coinsurance, copayments, and deductibles. Original Medicare doesn't include prescription drug coverage, so s beneficiary also might want to add a standalone Part D plan.

52. Medicaid is another possible option to help cover health-care costs. Medicaid is administered independently by each separate state. Eligibility

depends on a recipient's income and whether he/she meets specific requirements.

53. To administer the Medicare Program, the Secretary works through the Medicare Administrator with various contractors and entities to undertake the Secretary's various required functions.

54. The Administrator of CMS functions through these various contractors to administer the Medicare program. The Administrator's CMS bureaucracy issues the requisite contracts and oversees the administration of the contracts.

55. The Administrator issues contracts for Medicare Administrative Contractors [hereinafter, MAC]; Zone Protection Integrity Contractors [hereinafter, ZPIC; sometimes called Safeguard Contractor]; Recovery Audit Contractors [hereinafter, RAC]; and Qualified Independent Contractors [hereinafter. QIC].

56. CMS relies on a network of MACs to process Medicare claims, and MACs serve as the primary operational contact between the Medicare Fee-ForService program, and approximately 1.5 million health care providers enrolled in the program. MACs enroll health care providers in the Medicare program and

educate providers on Medicare billing requirements, in addition to answering provider and beneficiary inquiries. Collectively, the MACs and the other Medicare claims administration contractors process nearly 4.9 million Medicare claims each business day, and disburse more than $365 billion annually in program payments.

57. Medicare services providers are the contact point between the Medicare program and the patients who receive services and items that are paid for under the Medicare program. Gregg Popkin lawfully owns and did lawfully operate Atlantic in the State of Florida which state does permit non-physicians to own and operate medical practices. Pursuant to the Medicare program and Florida's various laws, Atlantic did operate under a Medicare provider number lawfully rendering medical services to patients through licensed physicians and other providers who worked for Atlantic.

58. The primary goal of ZPICs is to investigate instances of suspected fraud, waste, and abuse. ZPICs are supposed to develop investigations and take certain action to ensure that Medicare Trust Fund monies are not inappropriately paid. They also are supposed to identify what they believe to be any already paid improper program reimbursements that are to be recouped by the MAC.

59. The employees of the ZPICs, RACs and MACs are not trained as 1811

criminal investigators [under OPM classification series 1811], like the Inspector General's Special Agents are, but the ZPICs and RACs staff make recommendations to the MACs that cause the withholding and recoupment of providers' payments under the Medicare program. MACs own staff similarly make recommendations that result in such denials of payments prospectively and retroactively. MAC have authority to undertake pre-payment reviews as well as to initiate the process to obtain recoupments. The various Medicare Contractors are under substantial pressure to justify the renewal of their contracts and/or issuance of new contracts to them.

60. The President of the United States has already concluded that there is $500 billion dollars in waste, fraud and abuse in the Medicare program over the 10 year then projected period. The President advised that the money was already intended to be used to pay for non-Medicare healthcare related matters which CMS would, in part, be involved in the administration of.

61. These various contractors and staff are all aware that the administration has decreed that there is $500 billion dollars in waste, fraud and abuse in the Medicare program that must be identified to pay other administration priorities that require funding.

62. The President's declaration of $500 billion dollars of waste, fraud, and abuse puts great pressure upon the Medicare personnel and their contractors' staffs to recoup and save $500 billion from the Medicare program for the administration's other priorities.

63. First Coast is acting as Medicare Administrative Contractor under a contract with CMS for the State of Florida among other locations.

64. The Recovery Audit Contractor [RAC] program's mission is to identify and correct Medicare improper payments through a bounty system of payments based upon the detection and collection of overpayments made on claims of health care services provided to Medicare beneficiaries. The RAC program is theoretically supposed to identify underpayments to providers, as well. However, in a demonstration program between 2005 and 2008, the program resulted in $900 million in overpayments being returned to the Medicare Trust Fund and only about $38 million in underpayments returned to health care providers.

65. As a result, Congress required the Secretary of the Department of Health and Human Services to institute (under Section 302 of the Tax Relief and Health Care Act of 2006) a permanent and national Recovery Audit program to

recoup overpayments associated with services for which payment is made under part A or B of title XVIII of the Social Security Act [the RAC program]. RACs have as tremendous pressure to initiate recoupments because they are paid a percentage of their recoupments. If a RAC does not make recoupments, then the RAC does not get paid, as well as it will not have its contract renewed.

66. Concerning payment determinations and appeals, the Secretary has established a system where there is an (initial) determination as to a payment or recoupment and thereafter, a subsequent determination at the same level that is referred to as a redetermination, both are conducted at what as referred to as a level one appeal.

67. Thereafter, the provider is entitled to appeal an adverse or partially adverse decision to another contractor which is called a Qualified Independent Contractor.

68. A Qualified Independent Contractor (QIC), is contracted by CMS and conducts the Level two appeals, called a reconsideration in Medicare Parts A & B. QICs have their own physicians and other health professionals to independently review and assess the medical necessity of the items and services pertaining to Medicare services. The QICs contracts also require renewal and QIC staff are aware that the

administration expects to save and recoup $500 billion dollars.

69. On information and belief, these QICs often use only one physician called a "Medical Director" in their review program and the remaining staff who administer the "independent review" are normally not physicians. These individuals are also utilized to make "medical necessity" determinations to review denials of service so as to determine if patients are to be provided services in the first place. At most, innumerable medical files are reviewed under the most loose concept of supervision of the "Medical Director" without an actual meaningful review by the "Medical Director" under whose name payment decisions and service decisions are made.

70. These various contractors are all aware that their contracts periodically come up for re-bidding and their service record among other factors is considered in reissuance or renewal of contracts.

71. After a QIC appeal, a provider who seeks to contest a payment determination, would normally file for an appeal to the Office of Medicare Hearings and Appeals [OMHA] for a hearing before an administrative law judge. A service provider is normally entitled to an evidentiary hearing before an ALJ as to any disputed facts on appeal to the OMHA. After an ALJ decision, a service

provider or the Medicare Contractor is entitled to an administrative appeal to the Medicare Appeals Council [MAC but distinguished from the Medicare Administrative Contractor (MAC)]. Before the Medicare Appeals Council, a service provider is not entitled to an evidentiary hearing.

72. Thereafter, a service provider is entitled to an appeal to United States District Court.

73. On or about December 24, 2013, Nancy J. Griswold, Chief Administrative Law Judge, issued an undated memorandum that announced that "due to the rapid and overwhelming increase in claims appeals, effective July 15, 2013, OMHA temporarily suspended the assignment of most new requests for an Administrative Law Judge hearing to allow OMHA to adjudicate appeals involving almost 357,000 claims for Medicare services and entitlements already assigned to ***its 65 Administrative Law Judges*** (emphasis added). This temporary measure was necessitated by a dramatic increase in the number of decisions being appealed to OMHA, the third level of administrative review in the Medicare claim and entitlement appeals process."

74. The memorandum continued ..."In just under two years, the OMHA backlog has grown from pending appeals involving 92,000 claims for services and

entitlement to appeals involving over 460,000 claims for services and entitlements, and the receipt level of new appeals is continuing to rise.....This past month, the number of receipts was over 15,000 per week. ... OMHA's average wait time for a hearing before an Administrative Law Judge has risen to 16 months and it is expected to continue to increase as the backlog grows."

75. This average is as to all of OMHA's cases and does not accurately reflect the wait for most services providers seeking to resolve their payment denials or recoupment [with interest] issues. Preference is dutifully given to patients seeking entitlement determinations for services.

76. Patients are being denied services, because their entitlements cannot be timely determined.

77. The preference for patient entitlement determinations is understandable but using it in an average computation glosses over the actual wait time for providers to resolve their payment issues.

78. On information and belief, preference is also given to hospital for payment of their services.

79. Additionally, the estimated wait time was based upon 460,000 backlogged cases when initially disclosed by CMS and CMS now estimates that the backlog is more like 800,000 and growing.

80. Additionally, the average wait time estimated by the CMS fails to consider that Hospitals and beneficiaries entitlement cases are afforded priority assignment to ALJs; thus, creating a greater backlog for non-hospital providers who are assigned without such priority.

81. Now the Secretary has caused the Chief ALJ to accept cases for assignment to ALJ under the guise of corrective steps having being taken. However, on information and belief, specific ALJs are not being assigned specific cases until their own particular dockets permit assignment.

82. This does not constitute any ill reflection upon the ALJs but without the assignment to ALJ dockets until the ALJs are available to work the case, it causes a distortion of facts in the representation of the backlog when discussed by the CMS and Secretarial administrations.

83. In reality the backlog of provider cases awaiting hearing has risen to an estimated approximate 800,000 and growing according to the Secretary's testimony before Congress.

84. Gregg Popkin and Atlantic Medical have no effective AUJ appeal rights to exhaust.

85. The prepayment review status of Atlantic Medical as set out herein and

the effective denial of AUJ review acts as a de facto suspension by CMS without any of the due process procedures that providers are entitled under CMS regulations [42 C.F.R. 406.371, etc. seq.] and the law.

86. The prepayment review status of Atlantic Medical as set out herein and the effective denial of AUJ review acts as a de facto forfeiture of property by CMS without any of the due process procedures that providers are entitled under the law.

87. The appeal statute, itself, now provides for an AUJ hearing within 90 days of being filed when previously that deadline was only established by regulation.

88. A number of Atlantic Medical's claims have already been waiting 90 days and, thereby, have already exhausted the appeal process.

**Specific Facts as to Gregg Popkin and Atlantic Medical**

89. From on or about July 2013 until on or about March 2014 Gregg Popkin and Atlantic Medical operated a medical practice located in Fort Lauderdale.

90. Atlantic Medical had received its provider number while in Fort Lauderdale which provider number remains with Atlantic Medical regardless

of its location. The provider number represent Atlantic Medical's provider agreement with Medicare and is a contract.

91. While a provider number remains constant with a particular provider, the provider will be issued separate Provider Transaction Access Number (PTAN) when operating from different locations.

92. This Fort Lauderdale location was administered by First Coast, as CMS' Medicare Administrative Contractor [MAC].

93. On information and belief, the administrative claims processing and other First Coast functioning, at this Fort Lauderdale geographic location was administered by a particular unit within First Coast. This First Coast unit was separate and apart from the First Coast unit that administers First Coast Miami jurisdiction.

94. On or about March 2014, Gregg Popkin moved the medical practice location of Atlantic, to 930 S. W. 82 Avenue, Miami, Florida 33144 from its Fort Lauderdale location.

95. Gregg Popkin continued the Miami medical practice location of Atlantic until Gregg Popkin was forced to close Atlantic's doors due to the Defendants' acts and omissions complained of herein.

96. While operating in Fort Lauderdale, Atlantic had no particular unreasonable problems with CMS's contractors or First Coast.

97. On information and belief, at Atlantic's Miami location, a different unit of First Coast administrated the claims processing and other functioning than that at the Fort Lauderdale location.

98. When Gregg Popkin moved Atlantic's practice location to Miami, Atlantic Medical was required to undergo a recertification process in order to obtain a new Provider Transaction Access Number (PTAN).

99. This recertification process required the inspection of the premises and the issuance of a new PTAN number.

100. When the CMS contractor's staff was on premises recertifying Atlantic for the new PTAN number, Atlantic had on premise a new, one day a week part time hire, a Board Certified Physiatrist, Doctor of Physical and Rehabilitative Medicine, by the name of Dr. Gary Jett, M.D.

101. The CMS site recertification surveyor, Larry Reynolds [site verification contractor], knew Dr. Jett and upon information and belief, had an adverse impressions of whom because he worked part time at some other medical practice, unrelated to Atlantic Medical and Gregg Popkin.

102. The CMS contractors' staff had reflected upon this individual in a

disapproving manner. They indicated that he had worked for a Chiropractic Physician, Dennis Nobbe who owned a medical practice of which they apparently did not approve.

103. It had been around November, 2013, that Dr. Jett came to Atlantic Medical for an interview with Gregg Popkin by introduction of a mutual acquaintance.

104. Dr. Jett had come for an interview to determine if Gregg Popkin and Dr. Jett might desire to associate in an employment relationship of some kind between Atlantic Medical, Gregg Popkin and Dr. Jett.

105. Florida permits non-medical doctors to own physician practices.

106. Dr. Jett had come highly recommended to Gregg Popkin as a Board Certified Physiatrist [Doctor of Physical Medicine and Rehab].

107. Dr. Jett and Gregg Popkin quickly did develop a professional relationship, professional association and professional friendship between themselves that was conducive to and did manifest in the establishment in a part-time employment contract by Atlantic Medical of Dr. Jett which both believed would lead, in the future, to full time employment in some manner, as the practice developed in the Miami location.

108. Gregg Popkin did have Dr. Jett checked out for any adverse background. He was not on the HHS/OIG exclusion list nor any other public, governmental adverse list that Gregg Popkin was able to identify.

109. Gregg Popkin and Dr. Jett frequently discuss and interchanged ideas, thoughts and information as to medial issues and how to resolve various different medical issues and treatment protocols. They discussed future plans for the office development and how Atlantic Medical would be able to further use Dr. Jett in the practice.

110. They both looked forward to a continuing developing relationship that would be financially, professionally and personally advantageous for Gregg Popkin, Atlantic Medical and Dr. Jett.

111. On the day of survey during the period of April/May 2014, while on site of Atlantic Medical, the CMS site surveyor, Larry Reynolds [site verification contractor], inquired of Dr. Jett that don't I know you? Don't you work at Invinga Surgical Center [Dennis Nobbe owner] & Dynamic Medical and Chiropractic Center?

112. Dr. Jett responded that he did work there on a part-time basis. Mr. Reynolds sounded very accusatory to Dr. Jett. Mr. Reynolds facial expression and demeanor instantly changed when he saw Dr. Jett.

113. Gregg Popkin immediately had a very strong chilled feeling that something was wrong. This inquiry of Dr. Jett was made in front of Gregg Popkin, Popkin's wife Edith [office manager], Rakoya Thomas [Medical Assistant and front desk personnel] and Kevin Morrero [therapist].

114. All four individuals afterwards concurred that they had a bad feeling that something was wrong based upon Mr. Reynold's demeanor, verbal statements and physical expressions toward Dr. Jett.

115. Thereafter, Gregg Popkin did research and found that both clinics were under review through Medicare.

116. Subsequently, as the denials came in, Gregg Popkin and the other employees, each said on a number of occasions that something was wrong based upon how the reviewer, Larry Reynolds spoke and acted toward Gregg Popkin after seeing Dr. Jett.

117. Gregg Popkin felt so uncomfortable after Mr. Reynolds first saw Dr. Jett that Gregg Popkin said to Larry Reynolds, let me show you around, we do everything by the book here. I will show you our procedures and that is why we are busy.

118. While Mr. Reynolds seemed interested in the practice when he first came in the office, as soon as he saw Dr. Jett, his physical expressions, speech and

demeanor indicated that he was no longer interested in learning about the practice. It seemed as if he saw all that he wanted to see when he saw Dr. Jett. Reynolds looked around the office a little, said have a nice day and walked out without any further inquiry concerning the practice.

119. Gregg Popkin's whole mental thought process and attitudes concerning his relationship with Dr. Jett was immediately chilled by the experience with Mr. Reynolds.

120. About June 23, 2014, Gregg Popkin received a letter from First Coast written by Yvette Gallon that informed him that Atlantic Medical was being placed on prepayment review.

121. Gregg Popkin did not know what to make of it because they had not even gotten Atlantic Medical's Medicare Provider number yet and had not done any billings at the Miami location.

122. Yet, the June 23, 2014, letter said that the reason for the prepayment review was prior billings and the physical inspection.

123. Atlantic Medical had not had any billing issues in Fort Lauderdale.

124. For the whole time that Atlantic Medical operated in Fort

Lauderdale, they had approximately two requests for records. Also, they had not done any prior billings in Miami for they had not yet received their provider number.

125. The letter had to mean that something was wrong due to the survey. Gregg Popkin and Atlantic Medical were very concerned and chilled but did not understand the implications because they had not done any billings and had not received any prepayment demands or denials at that point.

126. After receiving the June 23, 2014, letter from Yvette Gallon, Gregg Popkin first called Ms. Gallon, whose name was on the letter.

127. Yvette Gallon advised "off of the record" that a provider on his staff had issues with a couple of other clinics and a home health agency. Gregg Popkin told her he was only a part time employee and only worked 4 to 8 hours a week for Atlantic Medical.

128. Yvette Gallon said nothing in response.

129. Thereafter, Gregg Popkin asked her for Medicare to come and do an

inspection and watch them do their procedures so Atlantic Medical can show that it did everything by the book or they can tell Popkin if anything was not being done correctly.

130. Yvette Gallon said we don't do site inspections for that purpose.

131. Dr. Jett's involvement with Gregg Popkin and Atlantic Medical's clinic was the only reason that she gave as why Atlantic Medical was on prepayment review.

132. In the same conversation that Gregg Popkin requested that Ms. Gallon arrange that CMS do an inspection to either educate us or approve Atlantic Medical and she denied the request, the issue of education arose and Ms. Gallon advised that Atlantic Medical could submit 5 charts and claims for education to go over them with one of their clinicians to see if anything was missing or incorrect.

133. She said someone would be contacting Atlantic Medical within two weeks.

134. Eight weeks went by with no calls so Gregg Popkin called Yvette again and asked about the training and when Atlantic Medical would be off review.

135. She said she never received the five claims even though Atlantic

Medical had a confirmation fax, so Atlantic Medical sent another five charts and claims to her. At this point, she said to Gregg Popkin, that this is a courtesy that they do for the doctors and they were not obligated to follow through, but she stated that because this was our second attempt for education Atlantic Medical would be put at the top of the list.

136. To this day Atlantic Medical and Gregg Popkin have never heard from First Coast as far as education as provided for under CMS Pub 100-08 Medicare Program Integrity Manual Transmittal 489 and it has been approximately a year. Furthermore, Yvette Gallon never offered Gregg Popkin or Atlantic Medical an opportunity to present any evidence so as to justify their being taken off of prepayment review. Additionally, neither Yvette Gallon nor anyone else at First Coast ever offered Gregg Popkin or Atlantic Medical an opportunity of a Notice and hearing of any kind as to prepayment review and the de facto suspension that Atlantic Medical and Gregg Popkin had been placed upon. They had never been offered nor afforded any of the procedures as provided for as to Medicare payment suspension under 42 C.F.R. 405.371, et seq.

137. In truth and fact, it is part of First Coast responsibility as a Medicare Administrative Contract to undertake education of Providers.

138. First Coast never afforded Plaintiffs education as provided for under Transmittal 489 in order for Plaintiffs to educate themselves off of the prepayment review list.

139. On information and belief, First Coast does not receive financial consideration and recognition for a suspension of a provider in the manner that it does for prepayment denials under a prepayment review procedure.

140. Under a prepayment review procedure as herein, where there exists virtually a 100% prepayment reimbursement denial rate, First Coast receives continuing credit for program funding savings to its financial advantage, incentive, and betterment while such rewards are not available via a suspension procedure.

141. Under a prepayment review procedure, providers are not afforded a hearing procedure of any nature but with a suspension, providers are afforded a non-in person, documentary hearing opportunity to rebut the reasons for the suspension, after having been afforded notice of the reasons for the suspension [42 CFR §405.371; §405.372(a)(1); §405.372(b)].

142. Under a prepayment review procedure, First Coast is supposed to afford a provider on prepayment review education which is intended to lead to the removal of the provider from the prepayment status.

143. First Coast is supposed to provide a criteria for removing Plaintiffs from the 100% prepayment review.

144. First Coast has failed to provide Plaintiffs with any such education.

145. First Coast has failed to provide Plaintiffs with any criteria for removing Plaintiffs from the 100% prepayment review.

146. First Coast has failed to provide Plaintiffs formal notice of the reasons for the prepayment review and/or de facto suspension. First Coast only informally, verbally, not for the record commented as to Dr. Jett being a persona non-grata. It was implied that he was the basis for the prepayment review but no opportunity to rebut was afforded Plaintiffs. This comment was not placed in writing.

147. When a provider is under prepayment review, the provider is supposed to be able to continue rendering services and be compensated for services rendered even if at a lower rate than billed.

148. When a provider is under suspension, the provider does not render services and is not compensated.

149. Plaintiffs have been under prepayment review and have continued rendering services until Plaintiffs had to close their operations due to basically a

100% prepayment denial for all services rendered, except for a de minus amount paid.

150. Plaintiffs were rendering services, while First Coast was taking credit for reimbursement denials.

151. First Coast had no intention of reimbursing Plaintiffs for the services rendered while Plaintiff was on prepayment review.

152. First Coast had used bogus excuses for the payment denials as set out in this complaint.

153. First Coast knew that the next level of administrative appeals would not reverse its denials for the reasons set out in this complaint.

154. First Coast knew that the ALJs of the Office of Medicare Hearings and Appeals [OMHA] are inundated with appeals and would not see these claims for years if ever.

155. First Coast knows and/or believes that it has judicial immunity for its denials of Plaintiffs' claims.

156. First Coast knew that it has minor if any future financial risk as a result of these denials.

157. First Coast knows that it must take such actions against Plaintiffs and others as part of its efforts to achieve the expectations of CMS for contract

renewal purposes.

158. After this issue arose, Gregg Popkin inquired of Dr. Jett concerning his status.

159. Dr. Jett advised that he hired an attorney to straighten out his home health agency issues.

160. Dr. Jett advised that he was not on prepayment review in St. Lucia where he has a practice and that he would take care of it.

161. Dr. Jett advised that he had worked for 1 home healthcare agency and some 40 other home health companies had used his name and signature and filed for about 740 claims that he never knew about.

162. Additionally, Dr. Jett also advised that Invinga Surgical Center [Dennis Nobbe owner] & Dynamic Medical and Chiropractic Center, where he also worked part-time, were having problems.

163. He asserted that he had done nothing improper and stated that his own personal clinic in St. Lucia was not even on review.

164. In the middle and/or end of August Atlantic Medical had initiated submitting billings and denials were being repeatedly received.

165. This acknowledgement by Yvette Gallon that Dr. Jett was the reason for Atlantic Medical being placed on prepayment review by First Coast totally chilled Gregg Popkin's professional relationship, professional association and professional friendship with Dr. Jett to the extent that Gregg Popkin shortly thereafter terminated Dr. Jett's part-time employment with Atlantic Medical, even though he did not desire to do so.

166 . Previously, Atlantic Medical had no adverse history with First Coast or CMS.

167 .The apparent necessity to and actually terminating Atlantic Medical's relationship with Dr. Jett gravely cost Atlantic Medical the benefits of a first Class Board Certified Physiatrist, which is difficult to procure and which Atlantic Medical would have not done but for Gregg Popkin's and Atlantic Medical's first amendment rights of association and speech having not been totally chilled and disrupted by First Coast and its employees and agents' acts and omissions as cited in this complaint.

168. Atlantic was adversely targeted by First Coast due to the brief employment of Dr. Gary Jett, without Atlantic having been afforded any opportunity to defend itself.

169. Based upon its innocent association with Dr. Jett, First Coast totally chilled Gregg Popkin's professional relationship, professional association and professional friendship with Dr. Jett to the extent that Gregg Popkin shortly thereafter terminated Dr. Jett's part-time employment with Atlantic Medical, even though he did not desire to do so and without Atlantic Medical and Gregg Popkin being afforded any Notice and Opportunity to clear their names.

170. Thereafter, First Coast continuously and repeatedly denied payments without justification and changed various unreasonable justification as to the same claims without a reasonable basis during its determination and redetermination process.

171. The unreasonableness of the review process is established by repeated denials based upon lack of documentation, as not existing, when it was submitted and documented by inventory lists and subsequently documented by digital copies.

172. Atlantic would submit claims for prepayment review with inventories of documentation being submitted. The claims and documentation would be remitted by certified mail.

173. Thereafter, First Coast asserted documentation was not submitted

that was clearly on the inventory of documentation submitted and, subsequently, even digitally documented as to having been submitted.

174. Additionally, when documentation was re-submitted for a redetermination and, then, First Choice would claim some other documentation was not submitted which had been submitted and so listed on the inventory of documentation submitted.

175. Appeals would be submitted to Q2Administrators, LLC, the Qualified Independent Contractor for Atlantic Medical.

176. Q2Administrators is overloaded and inundated with appeals generated by the mandate to recover and save $500 billion dollars in Medicare billings.

177. Q2Administrators would routinely deny claims by asserting lack of documentation which First Coast decisions often did not assert to be missing. After a period of time, Atlantic would submit its claim documentation on DVDs but the same process of erroneous denials continued even though the documentation had been provided on DVDs.

178. This process of not identifying and reviewing documentation that has been provided does not afford effective reviews.

179. The Office of Hearings and Appeals has an estimated 800,000 case backlog.

180. A provider cannot effectively be afforded a timely review of its claims and documentation when the hearing office has an estimated 5 year backlog and growing.

181. This pattern and conduct by First Coast constitutes a de facto suspensions and denial of program participation and a forfeiture and denial of funds and monies without effective judicial review.

182. Atlantic Medical had to close its doors and cease its medical practice even though its practice patients were pleased with its services and desired and do desire to have services rendered by Atlantic Medical.

183. Atlantic Medical's patients desire to have it continue its practice and to receive services from Atlantic Medical.

## CLAIM I
## DEPRIVATION OF PROPERTY INTEREST IN VIOLATION OF PROCEDURAL DUE PROCESS

1-183 Plaintiff realleges and incorporates paragraphs 1 through 183 of this complaint as if completely set forth herein.

184. On or about July 2013, Atlantic Medical and Gregg Popkin initially entered into a contractual provider relationship with Medicare at their Fort Lauderdale location after being subject to a certification process.

185. On or about July 2014, this contractual relationship was renewed after being subject to a recertification process at their Miami location.

186. By virtue of being afforded a provider number and PTAN number, Atlantic Medical and Gregg Popkin gained various appeal and procedural rights as set out in statute, regulation and protocol guidance.

187. These appeal and procedural rights are contractual in nature due to Atlantic Medical and Gregg Popkin entering into a provider agreement and becoming an in network provider of Medicare services, agreeing to program provisions which out of Network providers do not agree to honor and affording Medicare beneficiaries certain benefits as third party beneficiaries.

188. Atlantic Medical and Gregg Popkin gained various appeal and procedural and other rights and privileges as in Network providers of the Medicare program and agreed to certain terms and conditions for the benefit of the program and beneficiaries.

189. Pursuant to the Medicare Program, Atlantic Medical and Gregg Popkin had been paid certain monies by the program prior to moving to the

Miami location.

190. Atlantic Medical and Gregg Popkin had a legitimate expectation of continued payment pursuant to the Medicare Program.

191. Atlantic Medical and Gregg Popkin have a protected a protected property interest in their continued Medicare Provider Agreement and Medicare billing privileges by virtue of the various rights, procedures and processes as set out in this complaint and the various agency established rights, processes and procedures cited herein.

192. CMS has failed to afford Atlantic Medical and Gregg Popkin the procedural rights to which they are due under the Medicare program, as outlined in statute, regulation and Medicare's various guidance.

193. CMS has failed to comply with its own statute, regulations and guidance protocols.

194. On or about, July 23, 2014, CMS renewed Atlantic Medical and Gregg Popkin their provider number and issued a new PTAN number authorizing their participation in Medicare at the new location in Miami but simultaneously place them on 100% prepayment review without any valid justification.

195. CMS assert in writing that the 100% prepayment review was due to Atlantic Medical's payment history when at its previous location, Atlantic Medical had no adverse prepayment history.

196. The true reason for the 100% prepayment review was due to the short term employment of Dr. of Gary Jett, M.D, whose employment was terminated due to the hostility of CMS to him. The surveyor used by First Coast advised Gregg Popkin that they adversely viewed Gary Jett, MD.

197. Dr. Gary Jett was on no known exclusion or public sanction list.

198. The 100% prepayment review continued even after the employment Dr. of Gary Jett, M.D was terminated, after a short period of part time employment, due to First Coast hostility to Dr. Gary Jett.

199. Furthermore, unreasonable denials of payments were made through the prepayment review and continue to be made.

200. These continuing unreasonable denials are based upon the prior employment of Dr. Gary Jett, MD; the prejudice of CMS's contractor First Coast

towards anyone who employed or had employed Dr. Gary Jett and First Coast

need to appear to be identifying a portion of the $500 Billion declared to be

Waste, Fraud and Abuse in the Medicare system.

201.  First Coast on behalf of CMS made a determination to place

Atlantic Medical on 100% prepayment review based upon the criteria "of a

sustained or high level of improper payments" per CMS Manual System Pub

100-08 Medicare Program Integrity, transmittal 489. This criteria is found under

the Medicare Program Integrity Manual and adversely reflects upon the integrity

of both Atlantic Medical and Gregg Popkin. These allegations Plaintiffs deny

totally. Furthermore, when they were initially placed upon pre-payment review

on June 23, 2014, Plaintiffs had not even billed through the Miami office.

202. First Coast document its file as to such determination and further

disseminated that decision to CMS COR, Regional Office TM and BFL.

203. This unfounded decision has resulted in the complete closing of the

business of Atlantic Medical. Because their practice focuses on Osteoarthritis which

statistically effects the older population in a disproportionate number of patients, this

prepayment review precludes Atlantic Medical and Gregg Popkin's marketability

from a significant portion of those patients who are in need of them. Additionally, this prepayment review has precluded Atlantic Medical and Gregg Popkin's marketability with other third party payers. This prepayment review resulted in a nearly 100% denial rate based upon pretextual denial justifications by First Coast. The government is at fault in this matter.

204. There is no effective appeal process to Office of Medicare Hearings and Appeals ALJs due to the backlog in appeal cases of over 800,000 appeals.

205. This in effect implemented a 100% debarred Gregg Popkin and Atlantic Medical without an opportunity to appear before any authorized government official to make a determination as to the imposing of this 100% debarment upon Gregg Popkin and Atlantic Medical.

206. This mechanism, which is in effect 100% debarment by this 100% prepayment review and pretextual denial of claims by First Coast, has no effective review process as to the payments caused by de facto debarment/ prepayment review status and the resulting complete closing of the business.

207. This process effectively denied Atlantic Medical and Gregg Popkin participation in CMS Medicare and resulted in the complete loss of the business without any opportunity for meaningful procedural due process.

208. This process has precluded Gregg Popkin and Atlantic Medical from continuing in their chosen career/business, because even though Gregg Popkin and Atlantic Medical has submitted correct chart documentation, it has been unreasonably rejected by First Coast.

209. Gregg Popkin has attempted to be re-established by in addition to properly documenting Atlantic Medical's claim charts and other ways to be removed from prepayment review status.

210. These ways have included but are not limited to: multiple calls to Medicare and seeking educational material through First Coast which is listed as a way of being removed from prepayment review [per CMS Manual System Pub 100-08 Medicare Program Integrity, transmittal 489.]; hiring a Medicare consultant to review claims and to discuss with CMS and First Coast the removal of prepayment review status.

211. None of these efforts were effective as a result of the hostile system and First Coast's refusal to cooperate with Gregg Popkin and Atlantic Medical to be removed from prepayment review.

212. Gregg Popkin and Atlantic Medical opened the Miami office in March of 2014 without having been notified that they were being placed on prepayment review.

213. On June 17, 2014, Gregg Popkin and Atlantic Medical were first informed that they were being placed on a prepayment review, at all. Thereafter, sometime in November or December of 2014, they learned that it was nearly 100% prepayment review and without any prior notice nor opportunity to seek a correction of their status. For this information, they had to call a number of times to First Coast, in order to obtain it. First Coast would not even provide an error rate.

214. In July of 2014, by virtue of obtaining their new PTAN, Atlantic Medical and Gregg Popkin had continued legitimate expectations of due process rights and privileges under the Medicare program.

215. By virtue of the renewal of their PTAN and being recertified, Atlantic Medical and Gregg Popkin had continued legitimate liberty interests and privileges in the Medicare Program and its appeal and review procedures and expectations of fair play and due process.

216. By virtue of the Medicare appeal backlog, Atlantic Medical and Gregg Popkin are not being afforded to their rights and privileges under the Medicare program, such as due process before an AL and fair and impartial administrative staff at lower levels.

217. The Medicare Program creates certain future rights and privileges and due process procedures for Atlantic Medical and Dr. Popkin. The Medicare Program's due process procedure constituted constitutionally protected expectations for Gregg Popkin and Atlantic Medical as to safeguards from unreasonable and unconstitutional denial of due process as to property rights.

218. The Medicare Program provides for certain procedural rights and privileges of Atlantic Medical and Gregg Popkin related to their participation with the Defendant Department's Medicare Program.

219. The Medicare Program provides for fair and impartial due process at the First Level [First Coast]; Second Level [Q2Administrators] and Third Level [OMHA] of administrative review.

220. This fair and impartial due process has been denied Atlantic Medical and Gregg Popkin.

221. With the enormous backlog of cases before OMHA, there is no effective AL review or relief that can be reasonably expected in any time period which may be considered reasonable under Constitutional standards.

222. Atlantic Medical and Gregg Popkin's participation in the Medicare program established certain rights and privileges associated with it and those rights and privileges have been effectively terminated by the Defendants so as to deny Atlantic Medical and Gregg Popkin effective due process.

223.   The Constitution affords an individual certain rights before a liberty or property right under a contract with the Defendant can be terminated and that includes an opportunity for due process.

224.   The Defendant has failed to afford Atlantic Medical and Gregg Popkin due process and has failed to afford Atlantic Medical and Gregg Popkin and effective opportunity to provide input concerning the denial of their Medicare Participation contract rights and privileges and denial of their reasonable payments for services already performed under the Medicare Participation Agreement.

225. Gregg Popkin and Atlantic Medical were provided no notice nor opportunity to be removed from the prepayment review process and thereby effectively denied their contract and property interests in their continued participation in their Medicare Participation Agreement, their Medicare Claims and their property interest in their medical practice.

226. Gregg Popkin and Atlantic Medical were provided no effective opportunity to have their Medicare claim denials impartially and effectively adjudicated as provide by statute and regulation and thereby effectively denied their contract and property interests in their continued participation in their Medicare Participation Agreement, their Medicare Claims and their property interest in their medical practice.

227. The effective termination of Atlantic Medical and Gregg Popkin's Medicare Participation Agreement was in violation of provisions of their Medicare Participation Agreement.

228. The Defendant materially breached its obligations under the Medicare Participation Agreement and in effect rescinded the Medicare Participation Agreement.

229.   The termination of Atlantic Medical and Dr. Popkin's property rights and privileges under their Medicare Participation Agreement was without notice nor opportunity to be heard in violation of procedural due process.

230.  These violations have caused Atlantic Medical and Gregg Popkin to

suffer substantial and grave actual professional, financial and personal damages, including but not limited to mental distress, emotional trauma, embarrassment, humiliation, loss of income, loss to and jeopardizing of future professional, financial opportunities and employment.

231. Based upon the foregoing violations, the Dr. Popkin is entitled to the relief requested below.

## CLAIM II

## DEPRIVATION OF LIBERTY INTEREST IN VIOLATION OF PROCEDURAL DUE PROCESS

1-183. Plaintiff realleges and incorporates paragraphs 1 through 183 of this complaint as if completely set forth herein.

232. On or about July, 2013, Atlantic Medical and Gregg Popkin initially entered into a contractual provider relationship with Medicare at their Fort Lauderdale location after being subject to a certification process.

233. On or about July, 2014, this contractual provider relationship was renewed after being subject to a recertification process at their Miami location.

234. By virtue of being afforded a renewed provider number and new PTAN number, Atlantic Medical and Gregg Popkin gained various appeal and procedural rights as set out in statute, regulation and protocol guidance.

235. These appeal and procedural rights are both program and contractual in nature due to Atlantic Medical and Gregg Popkin entering into a provider agreement and becoming an in network provider of Medicare services, agreeing to program provisions which out of Network providers do not agree to honor and affording Medicare beneficiaries certain benefits as third party beneficiaries.

236. Atlantic Medical and Gregg Popkin gained various appeal and procedural and other rights and privileges as in Network providers of the Medicare program and agreed to certain terms and conditions for the benefit of the program and beneficiaries.

237. Pursuant to the Medicare Program, Atlantic Medical and Gregg Popkin had regularly been paid monies at his Fort Lauderdale office by the program prior to moving to the Miami location without any abnormal complications.

238. Atlantic Medical and Gregg Popkin had a legitimate expectation of

continued payment pursuant to the Medicare Program, as they started receiving initial payments at the Miami Office.

239. Shortly after moving to Miami, Gregg Popkin and Atlantic Medical closed the Fort Lauderdale Office, expecting to have a continuation of regular payments through the Miami office. While the Fort Lauderdale office was closed, it continued to receive Medicare payments for past services rendered at the Fort Lauderdale office. Based upon the denial of payments and prepayment review status, the Miami office was basically placed into a de facto suspension of payment status.

240. Atlantic Medical and Gregg Popkin had a protected liberty interest and a protected property interest in their Medicare Provider Agreement by virtue of the various rights, procedures and processes as set out in this complaint and the rights, privileges, processes and procedures cited herein.

241.   CMS has failed to afford Atlantic Medical and Gregg Popkin the procedural rights to which they are due under the Medicare program, as outlined in statute, regulation and Medicare's various guidance.

242. CMS has failed to comply with its own statute, regulations and guidance protocols.

243. On or about, July 2014, CMS renewed Atlantic Medical and Gregg Popkin their provider number and issued a new PTAN number authorizing their

participation in Medicare at the new location in Miami but simultaneously placed them on prepayment review without notice and shortly thereafter, placing them on 100% prepayment review without any valid justification.

244. CMS assert in writing that the 100% prepayment review was due to Atlantic Medical's payment history when at its previous location, Atlantic Medical had no adverse prepayment history.

245. The true reason for the 100% prepayment review was due to the short term employment of Dr. of Gary Jett, M.D, whose employment was terminated due to the hostility of CMS to him. The surveyor used by First Coast advised Gregg Popkin that they adversely viewed Gary Jett, MD.

246. Dr. Gary Jett was on no known exclusion or public sanction list.

247. The 100% prepayment review continued even after the employment Dr. of Gary Jett, M.D was terminated, after a short period of time, due to First Coast hostility to Dr. Gary Jett.

248. Furthermore, nearly 100% unreasonable denials of payments were made through the prepayment review process and continue to be made.

249. On information and belief, these continuing unreasonable denials are based upon the prior employment of Dr. Gary Jett, MD; the prejudice of CMS's contractor First Coast towards anyone who employed or had employed Dr. Gary Jett and First Coast's need to appear to be identifying a portion of the $500 Billion declared to be Waste, Fraud and Abuse in the Medicare system.

250. First Coast on behalf of CMS made a determination to place Atlantic Medical on 100% prepayment review, allegedly, based upon the criteria "of a sustained or high level of improper payments" per CMS Manual System Pub 100-08 Medicare Program Integrity, transmittal 489. This criteria is found under the Medicare Program Integrity Manual and adversely reflects upon the integrity of both Atlantic Medical and Gregg Popkin.

251. First Coast document its file as to such determination and further disseminated that decision to CMS COR, Regional Office TM and BFL.

252. This unfounded decision and dissemination stigmatized Gregg Popkin and Atlantic Medical and resulted in adverse contractual action, resulting in the complete closing of the business of Atlantic Medical. This unfounded decision and dissemination resulted in the complete closing of the business of Atlantic Medical. Because their practice focuses on Osteoarthritis which

statistically effects the older population in a disproportionate number of patients, this prepayment review broadly precludes Atlantic Medical and Gregg Popkin's marketability from a significant portion of those patients who are in need of them. Additionally, this prepayment review has broadly precluded Atlantic Medical and Gregg Popkin's marketability with other third party payers. The government is at fault in this matter.

253. There is no effective appeal process to Office of Medicare Hearings and Appeals ALJs due to the backlog in appeal cases of over 800,000 appeals.

254. This in effect implemented a 100% debarment against Gregg Popkin and Atlantic Medical without an opportunity to appear before any authorized government official to make a determination as to the imposing of this 100% debarment upon Gregg Popkin and Atlantic Medical.

255. This mechanism, which is in effect 100% debarment by this 100% prepayment review by First Coast, has no effective review process as to the payments or the stigma caused by debarment/prepayment review status and the resulted in the complete closing of this critical cost effective business.

256. This process effectively stigmatized Atlantic Medical and Gregg Popkin throughout CMS and the government and before the public in general and resulted in the complete loss of the business without any opportunity for meaningful due process and resulted in the dissemination of untrue statements as to morals, character and integrity.

257. CMS Medicare Program Integrity Manual Pub 10-08 Transmittal 489 specifically provides for 100% prepayment review on the basis of the likelihood of "a sustained or high level of improper payments".

258. This process has broadly precluded Gregg Popkin and Atlantic Medical from continuing in their chosen career/business, even though on a number of occasions, Gregg Popkin and Atlantic Medical has submitted correct chart documentation that has been unreasonably rejected by First Coast.

259. This unfounded decision and dissemination stigmatized Gregg Popkin and Atlantic Medical and resulted in the complete closing of the business of Atlantic Medical. Because their practice focuses on Osteoarthritis which statistically effects the older population in a disproportionate number of patients, this prepayment review broadly precludes Atlantic Medical and Gregg Popkin's

marketability from a significant portion of those patients who are in need of them. Additionally, this prepayment review has broadly precluded Atlantic Medical and Gregg Popkin's marketability with other third party payers. The government is at fault in this matter.

260. Gregg Popkin has attempted to be re-established Atlantic Medical as a functional CMS provider and remove their stigma, in addition to continuing to properly document Atlantic Medical's claim charts and claims, by other ways so as to remove them from prepayment review status.

261. These ways have included but are not limited to: multiple calls to Medicare and seeking educational material through First Coast which is listed as a way of being removed from prepayment review [per CMS Manual System Pub 100-08 Medicare Program Integrity, transmittal 489.]; hiring a Medicare consultant to review claims and to discuss with CMS and First Coast the removal of Atlantic Medical from prepayment review status.

262. None of these efforts were effective with CMS and First Coast officials to remove Gregg Popkin and Atlantic Medical from the prepayment review list, as a result of the existing stigma and hostile CMS system. First Coast was supposed to attempt education prior to placing Atlantic Medical and Gregg Popkin on 100% prepayment review and failed, upon request, to do so. First

58

Coast was supposed to develop "criteria for removing the provider from 100% prepayment review" and either failed to develop such criteria or refused to provide same when such information was sought by Gregg Popkin and his Medicare Consultant.

263. Gregg Popkin and Atlantic Medical opened the Miami office in March of 2014 without having been notified that they were being placed on prepayment review.

264. On June 17, 2014, Gregg Popkin and Atlantic Medical were first informed that they were being placed on prepayment review. At that point, it was nearly 100% prepayment review and shortly thereafter, it went into full prepayment review without any notice nor opportunity to seek a correction of their status.

265. By virtue of their new PTAN, Atlantic Medical and Gregg Popkin had continued legitimate expectations of due process rights and privileges under the Medicare program.

266. By virtue of their new PTAN and being recertified, Atlantic Medical and Gregg Popkin had continued legitimate liberty interests and privileges in the Medicare Program and its appeal and review procedures and expectations of fair

play and due process.

267. By virtue of the Medicare appeal backlog, Atlantic Medical and Gregg Popkin are not being afforded their rights and privileges under the Medicare program, such as due process before an AUJ and fair and impartial administrative staff at lower levels.

268. The Medicare Program creates certain rights and privileges and due process procedures for Atlantic Medical and Dr. Popkin. The Medicare Program's due process procedure constituted constitutionally protected expectations for Gregg Popkin and Atlantic Medical as to safeguards from unreasonable and unconstitutional stigma.

269. The Medicare Program provides for certain procedural rights and privileges of Atlantic Medical and Gregg Popkin related to their participation with the Defendant Department's Medicare Program.

270. The Medicare Program provides for fair and impartial due process at the First Level [First Coast]; Second Level [Q2Administrators] and Third Level [OMHA] of administrative review.

271. This fair and impartial due process has been denied Atlantic

Medical and Gregg Popkin.

272. With the enormous backlog of cases before OMHA, there is no effective ALJ review or relief that can be reasonably expected in any time period which may be considered reasonable under Constitutional standards.

273. Atlantic Medical and Gregg Popkin's participation in the Medicare program established certain rights and privileges associated with it so as to avoid being unjustly stigmatized and those rights and privileges have been effectively terminated by the Defendants so as to deny Atlantic Medical and Gregg Popkin effective due process, while stigmatizing them within government files and before the general public.

274. The Constitution affords an individual certain rights before a Liberty right with the Defendant can be terminated and that includes an opportunity for due process.

275. The Defendant has failed to afford Atlantic Medical and Gregg Popkin due process and has failed to afford Atlantic Medical and Gregg Popkin and effective opportunity to provide input concerning the denial of their Medicare

Participation and the stigma cited in this matter.

276. The government by attacking the personal and corporate reputation of Gregg Popkin and Atlantic Medical has achieved in substance an alteration of their status that if accomplished through formal means would constitute a deprivation of liberty and the government has seriously affected and destroyed their ability to obtain contracts in their field of medical practice. The contracts would be with patients and other third party payers and not just Medicare.

277. The termination of Atlantic Medical and Gregg Popkin's Liberty rights of not being stigmatized by having a determination as having a "likelihood of a sustained or high level of improper payments" without notice nor opportunity to be heard is in violation of procedural due process.

278. These violations have caused Atlantic Medical and Gregg Popkin to suffer substantial and grave actual professional, financial and personal damages, including but not limited to mental distress, emotional trauma, embarrassment, humiliation, loss of income, loss to and jeopardizing of future professional, financial opportunities, contracting and employment.

279. Based upon the foregoing violations, the Gregg Popkin and Atlantic edical are entitled to the relief requested below.

## CLAIM III
## DEPRIVATION OF AND RETALIATION FOR EXERCISING RIGHTS OF SPEECH AND ASSOCIATION IN VIOLATION OF THE FIRST AMENDMENT

1-183. Plaintiff realleges and incorporates paragraphs 1 through 183 of this complaint as if completely set forth herein.

280.  Gregg Popkin and Atlantic Medical possess First Amendment Rights of Association and Freedom of Speech.

281. Gregg Popkin and Atlantic Medical engaged in the constitutionally protected right to Speak and Associate with Dr. Jett.

282. The Defendant's actions caused Gregg Popkin and Atlantic Medical to suffer an injury as set out in this complaint in paragraphs 1-184 that would chill a person of ordinary firmness from continuing to engage in that activity.

283. The Defendant's adverse action was substantially motivated as a response to Gregg Popkin and Atlantic Medical's exercise of their constitutionally protected conduct of Associating with and Speaking to Dr. Jett who until this time has not been placed on a suspension or other adverse list by Defendant and who until this time has been permitted to continue billing Defendant for services and items rendered to Defendant's Medicare beneficiaries.

284. When First Coast initially placed Gregg Popkin and Atlantic Medical

on 100% prepayment review there existed no basis to conclude the likelihood of a sustained or high level of improper payments as required by CMS Pub 100-08 Transmittal 489.

285.    Defendant's placing Gregg Popkin and Atlantic Medical on 100% prepayment review on the basis of improper billings is a sham pretext for the retaliation against Gregg Popkin and Atlantic Medical for the exercise of their First Amendment Association with and Speech with Dr. Jett.

286.    Defendant's nearly 100% prepayment denial actions against Gregg Popkin and Atlantic Medical on the basis of improper billings is a sham pretext in violation of and for the retaliation for Gregg Popkin and Atlantic Medical's exercise of their First Amendment Association with and Speech with Dr. Jett.

287.    Defendants' adverse actions against Gregg Popkin and Atlantic Medical as cited herein in paragraphs 1-184 was substantially motivated as a response to Gregg Popkin and Atlantic Medical exercise of their constitutionally protected conduct of Association with and Speech to Dr. Jett.

288.   Defendants' adverse actions against Plaintiffs, as cited herein, is in violation Plaintiffs' First Amendment Rights and constitute violations of Plaintiffs' First Amendment Rights to Free Speech and Association.

## CLAIM IV

## RIGHT OF REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT 5 U.S.C. 552, et Seq.; 5 U.S.C. 701, et. Seq. and 5 U.S.C. 702 FOR A PERSON SUFFERING A LEGAL WRONG

1-183. Plaintiff realleges and incorporates paragraphs 1 through 183 of this complaint as if completely set forth herein.

289. Plaintiffs are persons within the meaning of 5 U.S.C. § 702 and are suffering the legal wrongs as set out in ¶¶ 1-184 above and Claims I-III above because of Defendant Secretary and Defendant HHS agency action and the action of its agent, First Coast, the Medicare Administrative Contractor for Defendants.

290.   Plaintiffs are persons within the meaning of 5 U.S.C. §702 and are adversely affected and aggrieved as set out in ¶¶ 1-184 above and Claims I-III above by agency action of Defendant Secretary and Defendant HHS within the meaning of relevant statutes cited herein and incorporated by reference.

291.   The Defendant Secretary and Defendant HHS enjoy sovereign immunity from suits for damages under the circumstances of this matter.

292.   First Coast is an agent of the Defendants Secretary and HHS and enjoys immunity accorded it by the United States under the circumstances of this matter.

293.   The Defendants have acted and failed to act in their official capacity

and under the color of legal authority as set out in ¶¶ 1-184 above and Claims I-III above.

294.   This action is not seeking a determination of reimbursement as provided for in Title 42 Section 405.

295.   This action and issues raised in this matter and the relief sought are Constitutional in nature and are separate and apart from that afforded under Title 42 Section 405 and the relief provided therein.

296.   Plaintiffs are seeking relief until the Defendants will apply to Plaintiffs the relief set out in Title 42 Section 405 without preference or escalation in que with those other Part B providers similarly situation.

297.   Title 42 Section 405 does not preclude this action.


## Relief That Is Not Requested Herein

298. Plaintiffs do not request that this Honorable Court adjudicate the substance of their multiples Medicare Reimbursement claims against Defendants.

299. Plaintiffs do not request that this Honorable Court grant Plaintiffs higher standing in the Medicare Provider Part B queue awaiting adjudication over other such Part B Medicare Providers to the disadvantage of those other providers.

300. Monetary damages are not requested and are not available against

Defendants due to their immunity that has been granted to them.

## Relief Requested Herein

301. However, inasmuch as Defendants' personnel through their violations as set out in Claims 1-4 above and within the context of the chaotic administrative environment in which Plaintiffs find themselves, where Plaintiffs have no effective administrative remedies available, and where Plaintiffs have been irreparable injured; the only viable relief is that which Plaintiffs are requesting below.

302. It is in the public interest for Defendants to act in accordance with the law and Constitution and to be brought into compliance by the Courts when they are not.

303. It is in the public interest for Plaintiffs to be permitted to render their effective pain management treatments to the general public which is being denied the public in Plaintiffs' service basin.

304. The Relief Requested is collateral to the substantive relief of a viable, meaningful administrative adjudication sometime in the future.

305. There will be no injury to the Defendants if the Plaintiffs' requested relief is granted for Plaintiffs are requesting that Defendants obey the law.

WHEREFORE, Plaintiffs requests that the Court award them the following relief:

1) As to Claims 1 - 4, Plaintiffs ask that Plaintiffs be granted injunctive and declaratory relief that the Defendants be ordered to remit all reimbursement claimed by Plaintiffs but being withheld from Plaintiffs and/or unprocessed by Defendants under any guise including but not limited to prepayment review;

2) As to Claims 1 - 4, Plaintiffs ask that Plaintiffs be granted injunctive and declaratory relief that the Defendants be ordered to cease any further harassment of Plaintiffs by any personnel of Defendants, employees, contractors and contractor employees;

3) As to Claims 1-4, Plaintiffs ask that Plaintiffs be granted injunctive and declaratory relief that the Defendants be ordered to cease accruing interest against Plaintiffs for any claims or monies asserted by Defendants against Plaintiffs' Medicare reimbursements until Plaintiffs are afforded a hearing before an Administrative Law Judge in the normal course of processing Part B Provider Claims in the Defendants' processing queue without any

acceleration and then the interest accruing be only prospectively;

4) As to Claims 1 through 4, Plaintiffs ask that Plaintiffs be granted injunctive and declaratory relief that the Defendants be ordered to cease any further adverse actions against Plaintiffs due to their association with third parties who are not identified on some lawfully published and public list of individuals who are lawfully determined by the Defendants to be a threat to the Medicare or other government programs;

5) Plaintiff requests that the Court Grant such other relief as the Court may deem just and proper.


Pursuant to 28 U.S.C. Section 1746 and under the penalty of perjury, I do hereby affirm that the factual allegations in this complaint are true and correct to be best of my information and belief.

1/27/16
Date

Dr. Greg R. Popkin, D.C.

68

**Date:** January 28, 2016          Respectfully Submitted,


<u>/S/Kenneth J Haber</u>
Kenneth Joel Haber, Esq.,
DC Bar Number # 324343
DC US District Court #324343
Counsel for Plaintiffs
Fmr. AUSA, Fmr. Sr. Atty. OIG/HHS,
12705 Fernberry Ln, Suite A,
Boyds, MD 20841 Tel
TEL:      301-670-0016
Fax:      301-948-3091
kjhesq@haberslaw.com
Complaint: Atlantic Medical v. Secretary
and Department of Health and Human
Services